# EXHIBIT 4

CLAIM NO: HP 14 B01038

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

PATENTS COURT

BETWEEN

04 JUL 2014

UNWIRED PLANET INTERNATIONAL LIMITED
(a company incorporated under the laws of the Republic of Ireland)

Claimant

and

(1) HUAWEI TECHNOLOGIES CO., LIMITED
(a company incorporated under the laws of the People's Republic of China)

(2) HUAWEI TECHNOLOGIES (UK) CO., LIMITED

(3) SAMSUNG ELECTRONICS CO., LIMITED
(a company incorporated under the laws of the Republic of Korea)

(4) SAMSUNG ELECTRONICS (UK) LIMITED

(5) GOOGLE INC.
(a company incorporated under the laws of Delaware, USA)

(6) GOOGLE IRELAND LIMITED
(a company incorporated under the laws of the Republic of Ireland)

(7) GOOGLE COMMERCE LIMITED
(a company incorporated under the laws of the Republic of Ireland)

Defendants

---

GOOGLE DEFENDANTS' DEFENCE AND COUNTERCLAIM

---

**Introduction**

1.     This is the Defence and Counterclaim of the Fifth, Sixth, and Seventh Defendants
(hereinafter, the "**Google Defendants**").

1

2. All allegations which the Google Defendants do "not admit" are allegations which they are unable to admit or deny, but which they require the Claimant to prove, and like phrases are to be construed accordingly. Paragraphs denoted by "§" are paragraphs of the Particulars of Claim.

3. In very broad summary:

3.1 none of the patents in suit is valid or infringed: in any event,

3.2 to the extent that any declared essential patent referred to in the Particulars of Claim (the "**Declared Essential Patents**") is valid and the Google Mobile Devices (as defined in the Particulars of Infringement) fall within its scope the Google Defendants are already permitted to use such patent pursuant to the licences of the manufacturers who have provided them with chipsets incorporating the relevant technology; in any event,

3.3 as regards the patents referred to in the Particulars of Claim which have been declared to be standard essential:

3.3.1 if they, or any of them, are held to infringe, it is admitted that they, or any of them, are essential to the standard(s) alleged;

3.3.2 the Claimant is subject to a number of obligations under relevant competition laws, including to grant licences to the patents on fair, reasonable and non-discriminatory ("**FRAND**") terms, which obligations the Claimant has breached, thereby disentitling it to certain parts of the relief that it has sought;

3.3.3 in any event, the Claimant itself asserts and relies upon declarations that it has made to offer licences on FRAND terms to patents which have been declared to be standard essential, which obligations the Claimant has breached, thereby disentitling it to certain parts of the relief that it has sought;

3.3.4 the Google Defendants are themselves entitled to and claim relief in respect of the infringements of competition law committed by the Claimant.

**DEFENCE**

**The Claimant**

4.      As to §1, it is admitted that the Claimant is an Irish company, incorporated in 1998.

5.      §2 and §3 are admitted. The patents in suit (the "**Patents**") are, and at all times have been, invalid for the reasons pleaded in the Grounds of Invalidity served herewith.

6.      §§4 and 6 are admitted.

7.      As to the facts and matters at §§5, 7 and 8 the Google Defendants plead as follows.

**Ericsson and Cluster LLC**

8.      Telefonaktiebolaget LM Ericsson ("**Ericsson**") is a global supplier of telecommunications network equipment, including radio base stations and core network infrastructure, and services. Its headquarters are located in Stockholm, Sweden. Ericsson describes itself as a "...*world leader in the rapidly-changing environment of communications technology – providing equipment, software and services to mobile and fixed network operators all over the globe...*". Ericsson states that 40 per cent of global mobile traffic runs through networks that it has supplied.[1]

9.      Cluster LLC is, or has been, an indirect subsidiary of Ericsson. It is a Delaware Limited Liability Company, incorporated on 21 November 2012.

**The Unwired Planet Group**

10.     The Claimant is a member of the Unwired Planet group of companies (hereafter the "**Unwired Planet Group**") and is, to the best of the Google Defendants' knowledge, a wholly-owned subsidiary of Unwired Planet LLC ("**UP LLC**"), a Nevada limited liability company, which is in turn an indirect subsidiary of Unwired Planet, Inc. ("**UP Inc.**"), a Delaware listed corporation.

11.     Until 2012, UP Inc. (under its former name of Openwave Systems Inc.) was active in the production and sales of mobile systems software and made use of relevant patented technology for that purpose. On 25 May 2012, following the sale of its

---

[1]      http://www.ericsson.com/thecompany/company_facts.

3

Mediation and Messaging Product Businesses to Marlin Equity Partners,[2] UP Inc. announced that it would henceforth no longer produce and sell mobile systems software, but would instead be *"...solely focused on a multi-pronged Intellectual Property (IP) strategy that includes licensing and, if necessary, enforcement to protect its patent portfolio of approximately 200 issued US and foreign patents, and approximately 75 pending applications..."*[3].

12.    The homepage of UP Inc.'s website refers to *"The Business of IP"* and contrasts an *"Old model"* (i.e. *"Patents Protect Products"*) with a *"New model"* (i.e. *"Patents Themselves are Products"*). UP Inc.'s website further states (1) that *"...Unwired Planet is pursuing a multi-pronged patent monetization strategy..."*[4], and (2) with respect to its results for Q1 2014, *"...We continue to aggressively pursue licensing opportunities while managing our operating costs..."*[5].

13.    To the best of the Google Defendants' knowledge, the Unwired Planet Group's sole, alternatively, principal, activity is the licensing and collection of royalties in respect of the portfolio of mobile telecommunications patents that it owns and/or claims to own (the **"Unwired Planet Group Portfolio"**). One commercial technique used by the Unwired Planet Group, including the Claimant, to further its commercial aims in this regard is the pursuit of litigation in various jurisdictions seeking *inter alia* injunctive relief.

14.    UP LLC was incorporated in Nevada on 13 September 2012.[6] UP LLC is an indirect subsidiary of UP Inc. and, since 10 March 2014, the Claimant has been a wholly-owned subsidiary of UP LLC. A diagram containing an overview of the Google Defendants' understanding of the (relevant) corporate relationships within the Unwired Planet Group is attached as Annex 1.

---

[2]    http://investor.unwiredplanet.com/releasedetail.cfm?ReleaseID=664259.

[3]    http://investor.unwiredplanet.com/releasedetail.cfm?ReleaseID=677001.

[4]    http://www.unwiredplanet.com/technology/.

[5]    http://investor.unwiredplanet.com/releasedetail.cfm?ReleaseID=803278.

[6]    MSA, Recital C.

**The Master Sale Agreement and related arrangements**

15.     On 10 January 2013, Ericsson, Cluster LLC, UP Inc., UP LLC and two further
        subsidiaries of UP Inc. – but not including the Claimant – entered into an agreement
        entitled "*Master Sale Agreement*" (hereafter "**MSA**") pursuant to which Ericsson
        agreed to transfer 2,185 patents and patent applications to UP LLC, including the
        Declared Essential Patents, together with the right to receive 100 further patents and
        patent applications in each of the following 5 years[7]. Ericsson retains the ownership of
        the remainder of its patent portfolio, including over 2,000 patents declared as being
        essential to ETSI mobile telephony standards. The Claimant has to date refused to
        disclose a copy of the MSA. A version of the MSA with heavy redactions and
        omitting all Annexes was made available to the US Securities and Exchange
        Commission (the "**SEC Version of the MSA**").[8]  Only having access to the SEC
        Version of the MSA makes it difficult if not impossible at this stage for the Google
        Defendants to plead out material parts of this Defence and Counterclaim and the
        Google Defendants therefore reserve the right to make amendments when the
        complete and unredacted version of the MSA is made available.

16.     Apparently pursuant to the MSA, so far as the Google Defendants can currently
        discern, on 11 February 2013, a large number of patents were assigned by Ericsson to
        Cluster LLC. On 13 February 2013 a large number of patents were assigned from
        Cluster LLC to UP LLC – but not to the Claimant – pursuant to patent assignment
        agreements exhibited at Annex 7 to the Particulars of Claim.

17.     As to §8, on 27 February 2014, the Declared Essential Patents and the '712 Patent,
        together with a substantial number of other patents previously held by UP LLC, were
        transferred to the Claimant as described in §8 of the Particulars of Claim on the terms
        set out in the exhibited at Annex 9 to the Particulars of Claim.

18.     Save as aforesaid, §§5, 7 and 8 are not admitted.

19.     As to §9, it is admitted that the Claimant is listed as the proprietor of the Patents in the
        UK register. The Google Defendants have no knowledge of the contents of the

---

[7]     MSA, Section 6.3.
[8]     http://www.sec.gov/Archives/edgar/data/1082506/000119312513012058/d466328dex102.htm.

application to the UK Intellectual Property Office and are unable to plead to the same. To the best of the Google Defendants' knowledge, the Claimant failed to register itself as proprietor of the Patents until making an application on 3 March 2014 which was accepted by the Intellectual Property Office with effect from 6 March 2014.

## ESSENTIALITY AND FRAND LICENCES

### The European Telecommunications Standards Institute ("ETSI")

20.    §10 is noted.

21.    §§11 to 15 plead to a number of issues relating to ETSI and its IPR Policy without explaining what ETSI is or describing its IPR Policy.  Prior to pleading to the detail of these paragraphs, the Google Defendants plead as follows:

22.    ETSI is an independent non-profit making organisation established under French law in 1988. Since 1992 it has been recognised by the European Union (and its predecessor, the European Community) as a European Standardisation Body.[9] ETSI is also the recognised standard-setting body in the telecommunications sector in Europe responsible for producing and adopting common standards in relation to information and communications technologies, including mobile communications equipment such as hand-held mobile phones and similar devices operating on mobile communications networks.[10]

23.    ETSI has adopted many technical standards that have harmonised mobile communications technology across Europe and have, to a large extent, also been adopted as the common standards elsewhere in the rest of the world. The technologies for which standards have been developed and adopted by ETSI include those listed below, and the Google Defendants note the Claimant's contention in this regard that some of the patents within the Unwired Planet Group Portfolio are incorporated within one or more of these standards:

23.1    the Global System for Mobile communication ("**GSM**"), a "second generation" mobile communications technology;

---

[9]    See Commission Decision 92/400/EEC of 15 July 1992, OJ [1992] L 221/55.

[10]    See Directive 98/34 of the European Council and Parliament OJ [1998] L 204/37 (as amended).

23.2   the Universal Mobile Telecommunications System ("**UMTS**") standard which incorporates the Wide-band Code-Division Multiple Access ("**W-CDMA**") base technology and is commonly referred to as "third generation" or "3G" mobile technology; and

23.3   the Long Term Evolution Standard (a successor technology to the UMTS technology), which is also known as "4G" or "4G LTE" ("**LTE**").

24.   Ericsson is, and has at all material times been, a member of ETSI, and has, therefore, agreed to be bound by the Rules of Procedure of ETSI (the "**ETSI Rules**").

**ETSI IPR Policy**

25.   The ETSI Rules include as Annex 6 a set of provisions known as the "*ETSI Intellectual Property Rights Policy*" (the "**ETSI IPR Policy**").

26.   As further set out below at paragraphs 55 to 56, the ETSI IPR Policy includes various provisions which are intended to limit the extent to which the standards-setting activities of ETSI restrict or distort competition in upstream technology markets and/or downstream product markets, given that an adopted common standard necessarily incorporates or requires sole use of particular technologies or methods, that are invariably protected by patents or other IPRs, in downstream markets and, therefore, excludes from commercial use other technologies or methods.

27.   Patents or other IPRs that are incorporated by and required to be used when practising an adopted standard are generally and by ETSI referred to as "*Essential IPR*". They are so called because their use is necessary/essential for any implementer that wishes to practise the standard in the downstream market. A patent that is essential in this manner is known as a "*Standard Essential Patent*" (hereafter "**SEP**").

28.   Clause 15.6 of the ETSI IPR Policy defines "*ESSENTIAL IPR*" as follows:

> "'*ESSENTIAL' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease or otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a*

> *STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL."*

Hereinafter, all references to "**Essential IPR**" refer to one or more IPRs that are "*essential*" within the meaning of Clause 15.6 of the ETSI IPR Policy.

29.     Clause 4.1 of the ETSI IPR Policy has at all material times provided for members to inform ETSI of Essential IPR during the development of a standard or technical specification.  It provides as follows:

> *"(...) each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted."*

30.     Clause 15(1) defines "STANDARD" as:

> *"STANDARD" shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs), ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs and including drafts of any of the foregoing, and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all MEMBERS, but not including any standards, or parts thereof, not made by ETSI."*

31.     In order to ensure that access to Essential IPR is not impeded, with a corresponding adverse impact upon competition in relevant downstream markets (as further referred to below at paragraphs 57 to 59), ETSI members are required, amongst other things, to commit to license their Essential IPRs (including their SEPs) on FRAND terms in accordance with Clause 6.1 of the ETSI IPR Policy, which at all material times has provided as follows:

> *"When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:*

- *MANUFACTURE, including the right to make or have made customised components and sub-systems to the licensee's own design for use in MANUFACTURE;*

- *sell, lease or otherwise dispose of EQUIPMENT so MANUFACTURED;*

- *repair, use or operate EQUIPMENT;*

- *use METHODS.*

- *The above undertaking may be made subject to a condition that those who seek licences agree to reciprocate."*

(hereafter an "**ETSI FRAND Undertaking**").

32.    Further, clause 6.1 bis of the ETSI IPR Policy has since March 2013 provided as follows:

> *"FRAND licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances that bind all successors-in-interest. Recognizing that this interpretation may not apply in all legal jurisdictions, any Declarant who has submitted a FRAND undertaking according to the POLICY who transfers ownership of ESSENTIAL IPR that is subject to such undertaking shall include appropriate provisions in the relevant transfer documents to ensure that the undertaking is binding on the transferee and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding all successors-in interest. The undertaking shall be interpreted as binding on successors-in-interest regardless of whether such provisions are included in the relevant transfer documents."*

33.    The Guide on IPRs published by ETSI to provide explanatory information about the ETSI IPR Policy, including the ETSI FRAND Undertaking, provides that ETSI expects companies which have declared essential IPR to *"engage in an impartial and honest IPR licensing negotiation process for FRAND terms and conditions"*.

34.    §11 is admitted.

35.    §12 is denied. Clause 4.3 of the ETSI IPR Policy does not deem that declarations are themselves fulfilled by the mere giving of declarations. Clause 4.3 of the ETSI IPR Policy states as follows: *"The obligations pursuant to Clause 4.1 above [to use reasonable endeavours to inform ETSI of Essential IPRs in a timely fashion and to draw to the attention of ETSI any IPR which might be essential to a technical proposal if adopted] are deemed to be fulfilled in respect of all existing and future*

*members of a patent family if ETSI has been informed of a member of this patent family in a timely fashion...".*

36.    As to §13, it is admitted that Ericsson and Unwired Planet LLC have made the declarations as alleged. Save as aforesaid, §13 is not admitted.

37.    §14 is admitted.

38.    As to §15:

    38.1    the first sentence is admitted;

    38.2    the second and third sentences are noted, although for the avoidance of doubt, it is denied, if it be so alleged, that the Claimant has offered licences to the Google Defendants on FRAND terms or in accordance with the Claimant's obligations under EU and/or UK competition law.

39.    As to the first sentence and each of sub-paragraphs (A) to (E) of §16, if, which is denied, the Google Mobile Devices are held to fall within any of the claims specified of the relevant Declared Essential Patent, it is admitted that the Declared Essential Patent is essential to the specified standard. The Google Defendants only plead herein to the releases and specifications in the versions set out in Annexes 16 to 20 inclusive to the Particulars of Claim and, in the absence of particulars as to what, if any, additional versions or releases are relied upon, the Google Defendants are unable to plead to the same and no admission is made in respect of such other versions or releases.

**THE DEFENDANTS**

**The Huawei Defendants**

40.    The Google Defendants cannot plead to the matters set out in §§17 to 20 in respect of the Huawei Defendants since these are matters outside their knowledge.

**The Samsung Defendants**

41.    The Google Defendants cannot plead to the matters set out in §§21 to 24 in respect of the Samsung Defendants since these are matters outside their knowledge.

**The Google Defendants**

42.    §25 to §28 are admitted.

43.    §29 is denied for the reasons set out paragraph 5 above and in the Defence to Google Particulars of Infringement.

44.    As to §30:

44.1    the first sentence is embarrassing for want of particularity and, pending further particularisation, is denied;

44.2    the second and third sentences are denied, save insofar as it is implicit in them that no negotiations between the Claimant and the Google Defendants have led to a licence agreement between them in respect of the Declared Essential Patents or any other patents in the Unwired Planet Group Portfolio, which is admitted by the Google Defendants. The Unwired Planet Group has, through its actions, evinced an intention to forgo negotiations and instead seek an injunction from this Court (while also reserving its right to seek injunctive relief in the German Courts) to pressure Google to accept non-FRAND terms for the licensing of the Patents: see the position as regards the so-called negotiations to date in Confidential Annex 2 hereto.

## PASS THROUGH LICENCES DEFENCE

**The Google Defendants have permission to use the Declared Essential Patents**

45.    By reason of the facts and matters pleaded herein, the alleged infringing acts of the Google Defendants in respect of the Declared Essential Patents have been and continue to be licensed in so far as the Declared Essential Patents are the subject of a licence from Ericsson to the manufacturer of the chipsets used in the Google Mobile Devices (as defined in the Particulars of Infringement). In the premises, it is denied that to the relevant extent the Claimant has suffered loss or damage as alleged or at all.

46.     The Google Mobile Devices are manufactured by third party original equipment manufacturers ("**OEMs**") and contain chipsets supplied by third party manufacturers (the "**Chipset Manufacturers**"). The OEMs and Chipset Manufacturers for the Google Mobile Devices are set out in Annex 3.

47.     The Google Defendants are in the process of making enquiries with the Chipset Manufacturers regarding licences between Ericsson and the Chipset Manufacturers. The Google Defendants have requested from the Chipset Manufacturers a copy of any licence(s) between the Chipset Manufacturers and Ericsson but have not yet obtained the same. The Google Defendants are in the process of making equivalent enquiries with the OEMs. In addition, the Google Defendants have requested, and the Google Defendants have made an application seeking, a full copy of the MSA from the Claimant. Such disclosure is necessary because there are material redactions from the SEC Version of the MSA that prevent the Google Defendants from being able to understand and plead fully to the relevant encumbrances (see, e.g., the redactions at section 6.7(a) and 6.17 of the SEC Version of the MSA). The Google Defendants reserve the right to amend this Defence (and Counterclaim) following the provision of the complete and unredacted MSA and related agreements and standard disclosure by the Claimant.

48.     Prior to disclosure and/or witness statements herein, the Google Defendants infer, as a matter of business efficacy and/or commercial necessity (the chipsets being useless unless incorporated into a device such as the Google Mobile Devices), that any licences granted by Ericsson to the Chipset Manufacturers, which cover the Declared Essential Patents, do:

48.1    include covenants, which are binding on successors in title, under which Ericsson agreed not to assert the licensed IPR (including the Declared Essential Patents) against persons seeking to manufacture, supply, repair or use mobile terminals containing such chipsets, including the Google Defendants; and/or

48.2    render the Patents unenforceable against persons seeking to manufacture, supply, repair or use mobile terminals containing such chipsets, including the

Google Defendants, by virtue of the doctrines of patent exhaustion and/or implied licence.

49. In the premises, in so far as the Declared Essential Patents are the subject of a licence from Ericsson to the Chipset Manufacturers of the chipsets used in the Google Mobile Devices, the Claimant is not entitled to enforce its present claims against the Google Defendants in respect of the Declared Essential Patents, and the Claimant is not entitled to damages or to any of the other relief claimed in the Particulars of Claim.

50. In the event that the Google Defendants do not have permission to use the Declared Essential Patents as aforesaid, then the Google Defendants rely upon the competition law defences set out below.

## UK AND EUROPEAN COMPETITION LAW DEFENCES

51. For the reasons explained below, the Google Defendants are entitled to a FRAND licence in respect of the Declared Essential Patents and the Claimant is prohibited under Article 102 of the Treaty on the Functioning of the EU ("**TFEU**") and/or section 18 in Chapter II of the Competition Act 1998 (the "**Chapter II Prohibition**" and "**the Act**") from seeking and enforcing an injunction against them.  For the avoidance of doubt, the Google Defendants are willing, and have at all material times been willing, to take a licence to the Declared Essential Patents that are valid and infringed on FRAND terms and undertake to do so on terms held by the Court (subject to appeals) or agreed between the parties to be FRAND.

**Overview – FRAND obligations and dominant firms**

52. Owners of SEPs holding a dominant position in a relevant market owe obligations to third party users of SEPs pursuant to Article 102 TFEU and/or the Chapter II Prohibition. To avoid abusing its dominant position, and to ensure genuine access on FRAND terms to each SEP to third party users of SEPs, the owner of each SEP, including the Claimant in respect of each of the Declared Essential Patents, is under an obligation to license that SEP on FRAND terms and conditions. This licensing obligation includes the following:

52.1 an obligation not to impose (directly and/or indirectly) prices which are unfair and/or excessive contrary to Article 102(a) TFEU and/or section 18(2)(a) of the Competition Act 1998;

52.2 an obligation not to limit or control production, markets or technical development contrary to Article 102(b) TFEU and/or section 18(2)(b) of the Competition Act 1998;

52.3 an obligation not to apply dissimilar conditions to equivalent transactions with other trading parties contrary to Article 102(c) TFEU and/or section 18(2)(c) of the Competition Act 1998;

52.4 an obligation to ensure that there is no bundling of other products, including non-essential patents, with any SEPs contrary to Article 102(d) TFEU and/or section 18(2)(d) of the Competition Act 1998.

53. For the purpose of giving proper effect to the obligation to license on FRAND terms and conditions as set out above, and in any event given its position as a dominant undertaking, the owner of each SEP, including the Claimant in respect of each of the Declared Essential Patents, is also under the following obligations:

53.1 to be prepared to license each SEP on FRAND terms; and

53.2 to be transparent as to the basis on which it is prepared to license each SEP, including by providing potential licensees with information about the terms on which it licenses or is prepared to license SEPs, including as to the scope of the licence; and

53.3 to enter into *bona fide* negotiations on FRAND terms with potential licensees and to continue those negotiations for a reasonable period of time; and

53.4 to refrain from commencing litigation seeking an injunction in respect of alleged infringement of SEPs until after there has been a reasonable period of *bona fide* negotiation with a potential licensee, absent objective justification; and

53.5     to refrain from seeking and/or enforcing an injunction against a third party user of SEPs, absent objective justification.

54.     The obligations set out in paragraphs 52 to 53 above shall be referred to hereinafter as the "**SEP Licensing Obligations**".

55.     The above-mentioned SEP Licensing Obligations are also generally reflected in the ETSI Rules and ETSI IPR Policy. Paragraphs 25 to 33 above are repeated herein. In particular, there are obligations on SEP owners who are also members of ETSI, and on their transferees, arising by virtue of the requirements of the ETSI IPR Policy. The basic purpose of the ETSI Rules and ETSI IPR Policy is that third parties wishing to obtain access to the standard for the purposes of participation in the relevant downstream markets that make use of the standard have a genuine opportunity to do so on FRAND terms. This is because:

55.1     the object and/or effect of the adoption of a particular technical solution by ETSI and/or its members as the common European standard is to exclude alternative technical solutions and the competition and choice in the relevant downstream markets that such alternative technology would otherwise provide; and

55.2     once a common standard has been selected that incorporates or requires use of a particular proprietary technology or method, then, if any undertaking wishing to manufacture products in the relevant downstream markets in accordance with the common standard is impeded from using that technology, that undertaking is liable to be eliminated from, alternatively will be materially disadvantaged in, competing to supply such products in the relevant downstream markets, with corresponding preventions, restrictions and/or distortions of competition in those markets. Similarly, competition will be prevented, restricted and/or distorted in the relevant downstream markets if certain or all such undertakings are able to use that technology only on terms that are excessive, discriminatory or otherwise not fair and reasonable; and

55.3     SEP owners are liable to extract supra-competitive (above FRAND) terms as a result of their ability to threaten to exclude undertakings wishing to manufacture products using the particular technology.

56.    Absent provisions for genuine access on FRAND terms, the agreements, concerted practices, decisions and/or unilateral conduct underpinning and/or comprised within the ETSI standards-setting process would infringe EU competition law, and in particular Article 101 TFEU / section 2 of the Act (the "**Chapter I Prohibition**") and/or Article 102 TFEU / the Chapter II Prohibition , and would therefore be void or otherwise unenforceable.   For these reasons, the ETSI IPR Policy has been established, modified and strengthened over time in response to recommendations of, and concerns expressed by, the EU Commission regarding the potential for the standards-setting activities of ETSI and for the ETSI Rules and ETSI IPR Policy to give rise to a contravention of EU competition law, including but not limited to being a condition for the legality of those arrangements under Article 101 TFEU / the Chapter I Prohibition and/or Article 102 TFEU / the Chapter II Prohibition.

**Relevant Affected Markets**

57.    Pending expert evidence, the Google Defendants aver that the following product markets exist and are relevant to this Defence and Counterclaim:

57.1    the "**Device Market(s)**" for the production and sale of mobile telecommunications devices including mobile handsets and tablets that comply with the relevant common technical standard(s) adopted by ETSI as applicable to telecommunications equipment for use in Europe, which common standards are applicable throughout Europe and have to a considerable extent also been used as common standards on a worldwide basis (the "**ETSI standards**");

57.2    the "**Infrastructure Market(s)**" for the production and sale of mobile infrastructure equipment used by providers of mobile telecommunications networks that complies with the ETSI standards;

57.3    the separate "**Technology Markets**" for the licensing of each of the Declared Essential Patents, that is essential for the production of any product or service in any of the markets in paragraphs 57.1 to 57.2 above.

58.    Each of the first two markets is referred to as a relevant "downstream market" and each Technology Market is a relevant "upstream market".

59.   Pending expert evidence, the geographic extent of each of the markets defined above is believed to be at least Europe.

**Dominance**

60.   Subject to provision of expert economic and/or market evidence the Google Defendants contend that the Claimant holds a dominant position in each of the separate Technology Markets relevant to each Declared Essential Patent.

PARTICULARS OF DOMINANCE IN RESPECT OF EACH
DECLARED ESSENTIAL PATENT

60.1   The Claimant has complete control over access (at the upstream level) to the use of certain technology that is essential for developing and/or manufacturing (at the downstream level) mobile telecommunications equipment and devices (including, in particular, mobile handsets) that comply with the relevant common technical standard(s) adopted by ETSI as applicable to telecommunications equipment for use in Europe. Those common standards are applicable throughout Europe and have to a considerable extent also been used as common standards applicable worldwide.

60.2   In particular, each genuine SEP must, by its very definition, be implemented in order to comply with the standard to which the said patent relates. Each such SEP cannot by definition be designed around, i.e. there is no alternative or substitute for each such patent. It is, therefore, impossible for undertakings wishing to enter, and remain in, the downstream markets for the design, manufacture, and supply of GSM, UMTS and LTE products to operate in accordance with these standards unless they can work the said standard essential patent.

60.3   As such, in respect of each Declared Essential Patent, the Claimant holds a 100% market share meaning that potential licensees, including the Google Defendants, on the relevant downstream markets have no other means of obtaining access to the said patent.

60.4    The Claimant does not itself compete on the relevant downstream markets. It is not, therefore, subject to any countervailing market power arising from the need itself to obtain licences to other Essential IPRs that may be owned by its licensees.

60.5    Absent the obligations referred to herein as the SEP Licensing Obligations, the Claimant is/would be able to exploit its market power in each relevant upstream market for the licensing of each Declared Essential Patent so as to prevent, restrict and/or distort competition in the relevant downstream markets, by denying or distorting genuine FRAND access to licensees.

60.6    The Declared Essential Patents are in force in various EU Member States. Accordingly, the Claimant's dominant positions are held not only in the United Kingdom but, in so far as relevant and applicable, in at least all or a substantial part of the EU.

60.7    The preceding sub-paragraphs are repeated but substituting for the reference to "Declared Essential Patents" a reference to each and all of any other patents comprised within the Unwired Planet Group Portfolio that is likewise "standard-essential" (i.e. essential for developing and/or manufacturing mobile telecommunications equipment or other devices that comply with relevant common technical standard(s) adopted by ETSI).

**Abuse**

61.    By virtue of its dominant position(s) as pleaded above, the Claimant has a special responsibility not further to restrict or distort competition either in the upstream Technology Market(s) in which it is dominant or in the relevant downstream markets and to comply with *inter alia* the obligations at paragraphs 52 to 53 above.  Subject to the provision of expert economic and market evidence, the best particulars of abuse, contrary to Article 102 TFEU and/or the Chapter II Prohibition that the Google Defendants can currently provide are as follows:

PARTICULARS OF ABUSE

61.1   The Claimant breached its obligation to refrain, absent objective justification, from commencing litigation seeking an injunction in respect of alleged infringement(s) of SEPs until after there has been a reasonable period of *bona fide* negotiation with the Google Defendants as potential licensees. The Claimant issued legal proceedings, before good faith FRAND licence negotiations with the Google Defendants had even properly commenced. By Claim Form dated 10 March 2014, the Claimant commenced the current proceedings, which include claims for injunctive relief. On the same day, the Claimant also commenced proceedings in Germany including a reservation of the right to claim injunctive relief on no notice. It was only on 22 April 2014 that solicitors for the Claimant sent a letter to solicitors for the Google Defendants enclosing a first "*License Proposal*" for a 5-year worldwide licence for both SEPs and non-SEPs. Reference is made to Confidential Annex 2 for the detailed particulars in respect of the so-called negotiations with the Google Defendants.   It is an abuse of the Claimant's dominant position to issue legal proceedings (including injunctive relief claims) prior to its communicating the terms of the so-called "*License Proposal*" to the Google Defendants. The proper and lawful course under Article 102 TFEU and/or the Chapter II Prohibition was for the Claimant first to negotiate FRAND terms in good faith for a reasonable period before commencing legal proceedings and/or before seeking injunctive relief. The Claimant made no effort to do so. The Claimant thereby sought, and is seeking, materially to distort the negotiating environment for a licence and thus to limit production, markets or technical development to the detriment of consumers.

61.2   The Claimant sought, and is seeking, to procure that the Google Defendants enter into licences in respect of the Declared Essential Patents on terms that are not FRAND as to scope and royalties and which are or would be less advantageous to the Google Defendants than FRAND terms. In so doing, the Claimant has sought, and is seeking, to impose prices which are unfair and/or excessive.

61.3    The Claimant has applied, and is applying, dissimilar conditions to equivalent transactions with other trading parties, thereby placing them at a competitive disadvantage. In particular, the Claimant (or other entities in the undertaking of which it forms part) has treated the Google Defendants worse than other actual or potential licensees of the patents (whether in the hands of the Claimant, of UP LLC, Cluster LLC or Ericsson). For example, to the best of the Google Defendants' knowledge, the Claimant has commenced and concluded FRAND license negotiations with Lenovo without forcing Lenovo to negotiate under the threat of injunctive relief. The Google Defendants specifically reserve the right to amend this discrimination aspect of their Defence (and Counterclaim) upon provision by the Claimant of disclosure in relation to its treatment of other actual and potential licensees.

61.4    The Claimant has acted with a manifest lack of transparency, contrary to its obligations as a dominant firm as set out at paragraphs 52 to 53 above, including by failing to provide sufficient information as to the terms on which it licenses, or is prepared to license, the Declared Essential Patents to other undertakings. As noted, the only specific proposal put forward by the Claimant to date was made on 22 April 2014 after it commenced the current proceedings. Further, as detailed in Confidential Annex 2 material components of that proposal remained unclear; for example no details of the patent portfolio proposed to be licensed by the Claimant were provided. Even when the Google Defendants sought clarification from the Claimant, the list provided by the Claimant was qualified by a general statement that the list *"may not have been updated to take into account the most recent transactions"*.

62.    The Google Defendants reserve the right to particularise further the Claimant's non-compliance with its obligation to license on FRAND terms following the provision of disclosure by the Claimant (and relevant third parties).

**Appreciable effect**

63.    The effects of the abuse of a dominant position pleaded at paragraph 61 above are appreciable.

64.   Via the patents acquired pursuant to the MSA and its own retained patents, the Unwired Planet Group (including the Claimant) has acquired the ability to have an appreciable effect on competition in upstream licensing markets and in downstream GSM, UMTS, and LTE product markets. The royalties sought by the Claimant by means of these proceedings and as a result of the MSA and Assignment Arrangements do appreciably raise, or are liable appreciably to raise transaction and other costs for the Google Defendants, which in turn has an appreciable effect on competition in upstream and downstream markets and, hence, upon intermediate and final consumers.

**Effect on Trade**

65.   The infringement of Article 102 TFEU / the Chapter II Prohibition pleaded at paragraphs 51 to 64 have UK-wide, EU-wide and potentially worldwide effects. The upstream Technology Markets and downstream markets affected by these infringements have actual or at least potential effects on trade, or the pattern of trade, between producers, suppliers, and intermediate and final consumers of products incorporating UMTS and LTE standardised technology in multiple territories worldwide.

## OTHER MATTERS

66.   §31 is noted. It is denied that the Claimant is entitled to the relief sought or any relief.

67.   §32 is denied. It is denied that the Claimant has suffered loss or damage as alleged or at all. It is averred that the Google Defendants intend lawfully to continue the acts of which complaint is made in the Particulars of Claim.

68.   Save as expressly admitted or not admitted in this Defence, the Google Defendants deny each and every allegation set out in the Particulars of Claim and Google Particulars of Infringement as if the same had been individually set out and traversed sequentially.

**COUNTERCLAIM**

69.    Paragraphs 5, 45 to 50 and 51 to 68 of the Defence are repeated.

AND THE GOOGLE DEFENDANTS COUNTERCLAIM FOR:

(1)    A declaration that at all material times the Patents and each of them were invalid.

(2)    An Order that the Patents and each of them be revoked.

(3)    A declaration that the Claimant's rights in the Patents and each of them are exhausted and/or subject to an implied licence in the Google Defendants' favour (see paragraphs 45 to 50 above).

(4)    A declaration that the Claimant is and has at all material times been obliged to offer to grant a licence to the Google Defendants on FRAND terms in relation to the Declared Essential Patents (see paragraphs 52 to 56 above).

(5)    A declaration that the Claimant has breached its obligation offer to grant a licence to the Google Defendants on FRAND terms in relation to the Declared Essential Patents, including:

(i)    by commencing, without objective justification, legal proceedings seeking for injunctive relief against the Google Defendants prior to the commencement and conclusion of good faith negotiations (see paragraph 61.1 above).

(ii)    in not offering to the Google Defendants a licence under the standard-essential patents comprised within the Unwired Planet Group Portfolio (including but without limitation to the Declared Essential Patents) on a royalty rate not exceeding FRAND terms (or subject to Court or arbitral determination of FRAND terms) (see paragraph 61.2 above).

(iii)    in applying dissimilar conditions to equivalent transactions with other trading parties (see paragraph 61.3 above).

(iv)    by breaching its obligation to provide sufficient information as to the terms on which it licenses, or is prepared to license, the Declared Essential Patents (see paragraph 61.4 above).

(6)     An order requiring the Claimant to offer a licence to the Google Defendants in respect of the Declared Essential Patents on FRAND terms and (if required), an order to enter into a licence on terms to be fixed by the Court following an inquiry to determine the FRAND licensing terms in respect of the Declared Essential Patents as part of the Unwired Planet Group Portfolio.

(7)     An injunction to restrain the Claimant (whether acting by its directors, officers, servants, agents or any of them otherwise howsoever) from seeking or enforcing an injunction against the Google Defendants in the UK to restrain the Google Defendants from infringing the Declared Essential Patents until such time as FRAND terms for a licence to the Declared Essential Patents have been agreed or set by a Court of competent jurisdiction and the Google Defendants have failed to enter into such a licence within 14 days of the FRAND terms having been agreed or set (subject to exhaustion of all judicial appeals).

(8)     Further or other relief.

(9)     Costs.

PAUL HARRIS QC<br>
ROBERT O'DONOGHUE<br>
BRISTOWS LLP

4 July 2014

**STATEMENT OF TRUTH**

The Fifth, Sixth, and Seventh Defendants believe that the facts stated in this Non-Technical Defence and Counterclaim are true.

I am duly authorised by the Fifth, Sixth, and Seventh Defendants to sign this statement.

Signed     ........................................

Full name     JAMES ROBERT BOON

Position     PARTNER

**SERVED** the 4th day of July 2014 by Bristows LLP, Solicitors for the Google Defendants.

<u>CLAIM NO: HP 14 B01038</u>

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>CHANCERY DIVISION</u>
<u>PATENTS COURT</u>
<u>BETWEEN</u>

UNWIRED PLANET INTERNATIONAL
LIMITED
(a company incorporated under the laws of the
Republic of Ireland)
<u>Claimant</u>

**and**

(1) HUAWEI TECHNOLOGIES CO., LIMITED
(a company incorporated under the laws of the
People's Republic of China)

(2) HUAWEI TECHNOLOGIES (UK) CO., LIMITED

(3) SAMSUNG ELECTRONICS CO., LIMITED
(a company incorporated under the laws of the
Republic of Korea)

(4) SAMSUNG ELECTRONICS (UK) LIMITED

(5) GOOGLE INC.
(a company incorporated under the laws of Delaware, USA)

(6) GOOGLE IRELAND LIMITED
(a company incorporated under the laws of the
Republic of Ireland)

(7) GOOGLE COMMERCE LIMITED
(a company incorporated under the laws of the
Republic of Ireland)
<u>Defendants</u>

---

GOOGLE DEFENDANTS'
DEFENCE AND COUNTERCLAIM

---

BRISTOWS LLP
100 Victoria Embankment
London  EC4Y 0DH

Tel:    020 7400 8000
Fax:    020 7400 8050
Ref:    310/PMJ/10118.0056

<u>Solicitors for the Google Defendants</u>